**United States District Court**
**Eastern District of Virginia**
**Alexandria Division**



MINNIS, ET AL

v. CASE NO. 1:10-CV-00096-TSE-TRJ

JOHNSON, et al.

---

## MOTION FOR REINSTATEMENT TO THE
## UNITED STATES DISTRICT COURT,
## EASTERN DISTRICT OF VIRGINIA DOCKET
## FOR APPOINTMENT OF COUNSEL AND SANCTIONS

---

# TABLE OF CONTENT

TABLE OF CONTENT ..................................... i

I.   Plaintiff's Counsel Investigation and
     Failure of Adequate Representation ............... 2

II.  Virginia Department for the Deaf and Hard
     of Hearing Investigations and Counsel ........... 8

III. Plaintiffs Attempts at Enforcement by
     State Remedy .................................... 13

IV.  Proceeding at Attempts for Resolution ........... 16

V.   Failure to Honor the Settlement Agreement
     to Date ........................................ 17

VI.  Failure of Negotiations and Mediation .......... 18

VII. Conclusion ..................................... 27

United States District Court
Eastern District of Virginia
Alexandria Division

Minnis, et al

v. Case No. 1:10-cv-00096-TSE-TRJ

Johnson, et al

MOTION FOR REINSTATEMENT TO THE

UNITED STATES DISTRICT COURT,

EASTERN DISTRICT OF VIRGINIA DOCKET

FOR APPOINTMENT OF COUNSEL AND SANCTIONS

The Deaf Plaintiffs in the above titled action move that the Court reinstate Case No.: 1:10-cv-00096 to the Court Docket in the United States District Court, for the Eastern District of Virginia, and that this court appoint an Attorney who is knowledgeable and actively maintains a legal practice in civil rights litigation and the Americans with Disabilities Act, to represent the Plaintiffs with the enforcement clause of the settlement agreement, which the Plaintiffs entered into with the Defendants on October 13, 2010.(**See Exhibit #1**)

The Deaf Plaintiffs also move and seek sanctions against the Virginia Department of Corrections and the

[1]

Washington Lawyers' Committee for Civil Rights and Urban Affairs, with regard to the above titled action.

## I. Plaintiff's Counsel Investigation and Failure of Adequate Representation

1. On October 13, 2010, Plaintiffs (currently only five original Plaintiffs reside at Powhatan Correctional Center) entered into a settlement agreement with the Defendants within the meaning of 18 U.S.C. §3626.

2. Over the past four years the Defendants have failed to reach full compliance with regard to this settlement in accordance with 42 U.S.C §12103 and 28 C.F.R. §35.104 and the Americans with Disabilities Act as amended by the ADA amendments Act of 2008 (See 42 U.S.C. §12102(4); P.L. 110-325.

3. Despite repeated communications (**Exhibits #2-10**) the Plaintiffs have been unable to get the Virginia Department of Corrections (VDOC), or the Washington Lawyers' Committee for Civil Rights and Urban Affairs (WLCCRUA) to act in good faith. Negotiations with regard to compliance and representation are no longer viable. The Plaintiffs ask for the matter to be reinstated to the the docket in light of failure of the Defendants to fully comply with the settlement agreement, the attorney's refusal to make appropriate inquiries,

[2]

to represent the legal issues as previously approved by the Court.

4. The Plaintiffs have, in accordance with the provisions of the settlement agreement, notified the Virginia Department of Corrections of the material breach of non-compliance, and have given the Defendants 60 days to investigate and/or cure the alleged breach of the agreement as stipulated. **(Exhibit #1 (Emphasis in red letters))** The Plaintiffs have sought non-binding mediation with the Defendants to no avail. **(Exhibits #11 & #12)**

5. The Plaintiffs have spoken with the attorneys and mailed copies of the enforcement letters; the Plaintiffs have repeatedly sought for specific and particular commitments to calls and conferences with the attorneys, Defendants, and ADA Coordinators for both the Virginia Department of Corrections, and the institutional ADA Coordinator to cure the defects. Any meetings with the Defendants have failed to produce good faith results. **(Exhibit #13)**

6. Up and until a July 16, 2014 meeting with the attorneys, they have repeatedly agreed to write the ADA Coordinator regarding enforcement, but failed to honor their commitments; by appearance it would seem when the money ran out the lawyers ran out.

[3]

7.  The Attorneys would not define the issues and demonstrate movement for and on behalf of the Plaintiffs for the first four years; activity indicative that actually intends that the Virginia Department of Corrections comply with their obligations to the settlement agreement of October 13, 2010. This lack of support has dissipated the plaintiff's ability to obtain full implementation of the defendant's commitment; the vital attorney/client communication has gone without discharge and the agreed upon performance.

8.  The Virginia Department of Corrections continues to imply the Defendants are working to resolve the various articles, of which Plaintiffs have complained. Have ordered necessary communication devices, or are looking to employ various staffing. The Plaintiffs want to point out with some emphasis that the Defendants say work is being done on these matters, but the Defendants lack initiative to resolve the issues. For instance, a means of notification which has gone without resolution after four years. Questions have been repeatedly posed in this regard without any meaningful resolution.

9.  For the past four years the attorneys have committed to the Plaintiffs that if they filed

[4]

grievances against the Defendant's the attorneys would address these matters, for instance; routine (bi-annually scheduled) shakedowns being a "significant communication" under the settlement agreement clause, and therefore avail the deaf with interpreters during these searches where often more than thirty questions are posed. Many grievances have been filed and sent to the attorneys with no positive developments. (**Exhibit #14a, #14b, #14c, #14d, #14e, and #14f**)

10. Communications with the Virginia Department of Corrections and the Attorney General have at no time been documented in ways (by email or letters) that are demonstrative of necessary follow-up communications to the Defendants, and the named Plaintiffs have at no time (with one or two exceptions) received copies of these or any contacts. The attorneys have made specific commitments to make such contacts, but have failed to do so in any evidenced or productive way.

11. There have been repeated requests that at least a written inquiry by the attorneys be made on the matters as outlined in the enforcement letter of last year. (**Exhibit #15**) The Plaintiffs have requested a letter (to appropriate representatives in the Office of the Attorney

[5]

General the ADA Coordinator for the Virginia Department of Corrections, and the ADA Coordinator at the institution) stating that one year ago the Plaintiffs agreed to allow the Defendants another year to come into complete compliance. The Plaintiffs have (by letters and grievances)created an awareness of the problems which exist, requesting that the attorneys please call the various state officials and offices to assert the need to at the <u>very</u> <u>least</u> do everything the Defendants have agreed to do in the settlement agreement; pointing out that doing so would eliminate a further need for litigious action. These communications have gone virtually without action or response by counsel for the Plaintiffs.

12. During the two year investigation period after the settlement as contained in the agreement, the attorneys for the Plaintiffs <u>never once visited the institution</u> to investigate implementation; the treatment of the deaf prisoners, status of various time sensitive compliance issues, and the many complaints as outlined in repeated correspondence to the lawyers for the Plaintiffs.

13. The Plaintiffs attorneys have entered into what appears to be an attorney/client relationship with an agent of the Defendants (Institutional ADA

Coordinator, Barry Marano) that has in the Plaintiff's opinion created a conflict of interest, and a breach in the adversarial process, as it seems that agent Marano is a witness for the Plaintiff's lawyers in at least one other case.

14. On August 21, 2014 in response to a complaint by the Plaintiffs (as to a letter to Barry Marano about non-compliance, which Deborah Golden (attorney for the Plaintiffs) had previously indicated would be made available to Plaintiff Richardson for review before being mailed to the Defendants) attorney Mincberger (unknown to the Plaintiff's as original counsel) stated in response to the failure of allowing such a review of the letter, "If you don't like it you can fire us." The Plaintiffs feel this is both inappropriate and lacks professional ethics.

15. As addressed in (2) above, the Plaintiffs did in fact withdraw the enforcement action of 2013 because the Plaintiffs realized that they were getting absolutely no legal support, and it seemed it was the best course of action for a number of reasons at the time, including that the Defendants became at times hostile, dismissing, and intimidating. The Plaintiffs had hoped to discuss these issues with the Attorneys who could more appropriately raise them, but could not do so with

[7]

any degree of success, despite sending them copies of the enforcement letter that the Plaintiffs themselves had drafted without legal assistance.

## II.   Virginia Department for the Deaf and Hard of Hearing Investigations and Counsel

16. In the settlement agreement (under section XVI, Monitoring and Compliance) the Virginia Department for the Deaf and Hard of Hearing (VDDHH) were to be permitted "to conduct an investigation to determine VDOC personnel's treatment of Deaf inmates." VDDHH never knew about, nor did they agree to, this stipulation prior to the settlement date (**Exhibit 16a and 16b**)

17. The ADA Coordinators and other departmental officials have not failed to note that Plaintiff's lawyers and the Virginia Department of Deaf and Hard of Hearing (VDDHH) have done nothing to assist us or call with a delineation of the Plaintiffs' concerns for categorical implementation of the settlement specifics. In one correspondence with the attorneys, in the second paragraph of their letter dated November 12, 2013, attorney Golden pointed out, "I cannot speak for other offices, but Plaintiffs are a very small organization with limited resources, and Plaintiffs can very rarely travel to out of state facilities. Again, please let us know if there is a **serious** issue that is not being addressed. I am under the impression from these documents that prison

[8]

officials are taking steps to address your
concerns, and this is the reason for the 'lack
of     activity'    you    wrote    about."
[Emphasis added](**Exhibit #17**)

In this regard:

1) The attorneys were awarded more than a
quarter of a million dollars for their
representation of our claims. In addition
they have a clause that covers their costs
at 150% if the Defendants must take further
action with regard to enforcement. The
Defendants have brought it to our attention
that writing and contacting our lawyers will
cause a bill of assessment from our
attorneys, and while it would seem that this
too would be a motivating incentive to come
into complete compliance, Defendants have
failed to adequately address the legal
issues and requirements. The attorneys, at
best, misrepresented the role VDDHH would
take to assist in enforcement.

2) Despite what the attorney asserted, the
Plaintiffs would represent to this Court
that all of the issues of noncompliance are
"serious" in nature. The reason Plaintiffs
and attorneys spent years working on these
individual issues is because they were all

important to ensuring social justice and equal treatment, as well as opportunities for the Deaf Community incarcerated in the VDOC consistent with the law. VDHH were represented as experts who would and could monitor compliance, this was never agreed to by VDDHH, and was untrue.

3) The reason for the point by point character of the settlement agreement is because there is an expectation the Defendants will do everything they have agreed to do in this regard. None of the matters in the enforcement letter have been adequately addressed as of this date. No monitoring by VDDHH or the lawyers was never accomplished as stipulated.

4) As an example: the emergency notification system. The law clearly requires there must be a visual emergency notification system installed in each housing unit, and in each individual room for the deaf and hearing impaired. VDOC conducts routine fire drills at Powhatan Correctional Center on a monthly basis, and there are no visual notification systems for these drills, or for circumstances in the event of an actual emergency. The Plaintiffs have repeatedly

[10]

requested that the Defendants simply install a red strobe in the housing units for the purpose of emergency evacuation, and have presented printed material (a book on the legal rights of the deaf and hearing impaired from Gallaudet Press) to show them how and why there is a need to come into compliance with the settlement agreement. Additionally, the Plaintiffs have demonstrated there is a law stipulating the Defendants must install these systems at the very least in each housing unit. The Plaintiffs have not insisted notification for the individual cells, which is legally required and mandated. It would seem to the Plaintiffs that agents of VDDHH would have possessed this sort of knowledge.

5) The Plaintiffs have made repeated requests for eBooks to access free talk radio mediums, television digital video recorders, to facilitate the ability of the Deaf Community to be able to rewind more complicated intellectual and educational programming that is very fast or very complex, and other free information from sources that Plaintiffs cannot otherwise access, but are available to other

[11]

prisoners. There has been no security reasoning as to why these auxiliary aids have not been approved, and no official response to the formal requests for approval. The request for these accommodations is only to put the Deaf Community on equal footing with the hearing prisoners in general population. In accordance with the settlement agreement these items can only be denied for valid security reasons. The VDOC has not provided any security reasoning for the delays, which amount to denials. However, a substantial period after the settlement the VDOC entered into a contract with a provider, that may contradict or violate the agreement with the Plaintiffs. The services of this contract provider are to (for a fee to prisoners) provide MP3 technology, but not materials with options of accessibility for the deaf. VDDHH could have assisted in support of these needs for equal communication access, but so far have declined.

6) The Plaintiffs have continually sought from the VDOC a means of communication with the Deaf Community (Plaintiffs) that is substantially as effective as verbal

[12]

communication to the general population, 28 C.F.R. § 35.160(a), and will, when necessary, include the provision of appropriate Auxiliary Aids and Services, such as Qualified Interpreters. On Page 14 of the settlement agreement there are stipulations about notifications as well as Communication that affords an inmate who is Deaf an opportunity to participate in, and enjoy the benefits of, VDOC's services, programs, or activities that is substantially equal to that enjoyed by a similarly situated inmate who is not Deaf. VDDHH has repeatedly touted they are experts in communication matters, but did not, and were not, encouraged by the Defendants, or by the Plaintiff's attorneys to participate in these or any matters in this regard.

## III. Plaintiffs Attempts at Enforcement by State Remedy

18. The attorneys contend in their previous letter; (Exhibit #17) that the Plaintiffs file a grievance in order to proceed with the enforcement clause of the settlement agreement. The legal fellow, Rebecca Turner stated, "We also recommend that you continue filing grievances as these issues come up." Rebecca Turner even sent a copy of the relevant clause:

[13]

Section XVIII (E) of the settlement agreement to Plaintiffs for review, stating "I hope this clarifies the matter."

19. The Plaintiffs have copies of the settlement agreement, some of these copies are highlighted in several colors and underlined to make notable the various violations and lack of implementations. These versions also have a table of contents that is exhaustive, and clearly delineates each and every section and section heading. None of these matters are in need of clarification; none of them require further grievances.

20. One named Plaintiff has spent thirty-three years in the Virginia Department of Corrections. The Plaintiffs are aware, as the attorneys should be, that the grievance procedure is an adversarial process.

   1. The grievance system was created by the Federal Courts to serve as a legal means to provide the possibility of state remedies in civil rights claims and complaints at the state level; the state remedy of the Plaintiff's claims have been exhausted previously.

   2. Prisoners seldom get an unbiased response, despite the ombudsman process, because the ombudsman work and live in

[14]

the community of those employees against whom the plaintiff's complaints are based.

21. The Plaintiffs have repeatedly attempted remedy through grievance procedures. Founded grievances have failed to find implementation. These grieved matters have not been addressed with the state officials by our attorneys. For instance, in the first grievance (**Exhibit #18**) on providing interpreters at scheduled shakedowns, the Virginia Department of Corrections stated interpreters would be provided. In a second grievance (**Exhibit #19**), (prompted by the attorneys) the VDOC indicated interpreters would not be afforded; both of those responses are in the possession of the attorneys, who have failed to notify the Plaintiffs of any further action in this regard as of this date.

22. A copy of a grievance form was supplied to the Plaintiff's attorneys, clearly delineating the repetitive clause: "This issue has been grieved previously in Grievance #." At the prison, filing repetitious grievances, is restricted by policy. Many prisoners (obviously other than the Plaintiffs) find that exercising their rights with regard to grievance procedure can be a process that generates retaliation by its nature; and is a

[15]

process (as in the case at point) that does not often lead to correction.

## IV.   Proceeding at Attempts for Resolution

23. Plaintiffs waited the additional year agreed to in a letter to the VDOC with regard to invoking the enforcement clause. Ninety (90) days prior to the end of that year Plaintiffs once again raised the issues not resolved by that date; no matter how petty these issues may appear to the parties outside of the prison, enforcement is not only necessitated, but what was agreed upon by the Defendants. Not being resolved by this time Plaintiffs desire the Court provide an attorney who can represent the class in the correct and appropriate manner.

24. The Plaintiffs desire to extend the length of the agreement beyond the five years as Plaintiffs proceed with the necessary litigious means to obtain further negotiations to bring the VDOC into compliance with applicable disability laws, and the terms of the settlement agreement; to at the very least reach full compliance with the existing agreement. This will require legal assistance, as no member of the class can represent the class, which (based upon conflicts with the current attorneys) requires appointment of a new attorney.

[16]

We respectfully ask that the Court appoint counsel to represent the Plaintiffs in this regard who will act in our best interest to see a complete implementation, at the very least, of the present settlement agreement; ask for extension of the agreement; and seek the development of a policy in the VDOC consistent with the law and the Americans With Disabilities Act to protect disabled prisoners in the future.

## V.  Failure to Honor the Settlement Agreement to Date

25. Pursuant to 18 U.S.C. §3626(c)(2) the Plaintiffs move the Court for reinstatement. As a matter of record, the Washington Lawyers' Committee for Civil Rights and Urban Affairs (WLCCRUA) took on the responsibility to follow-up in these matters when the Defendants decided to settle the case and created a mechanism for both enforcement and compensation in the event that enforcement was necessary. Furthermore, the attorneys have failed in their commitments made to the Plaintiffs and have not been honored their duty to seeing these matters through to their legal end and obligation. The schedule in the settlement decree for lawyers to monitor these resolutions was in the interest of everyone, and that commitment was not (at any time) honored. It remains important to the existing

[17]

Plaintiffs to achieve complete compliance. The
alleged compliance of the VDOC to date is in no way
indicative of adherence with the settlement
agreement. This compliance is vital to the
Plaintiffs in order to enjoy the protections
guaranteed by law.

## VI. Failure of Negotiations and Mediation

26. All attempts at the negotiations and mediation at
Powhatan Correctional Center via meetings with the
warden have been fruitless, but the named
Plaintiffs continue to meet as scheduled. With
every gathering the Defendants have violated the
settlement agreement by having multiple unrelated
and adversarial employees present, both from
Powhatan Correctional Center and from many other
offices within the VDOC. These are meetings which
were established by the settlement agreement. These
individuals are not supposed to be included in
these meetings, and their attendance has continued
to be a distraction. This diversion serves to limit
the Plaintiffs from a meaningful dialog, and
because of the pall cast on the meeting is a
continuing violation of the letter of the
agreement.

27. These other individuals (other than the VDOC's ADA
Coordinator Thornton) have provided absolutely no

positive input, and it appears that the Defendants are there at the behest of the warden for some sort of entertainment at the expense of the Deaf Community. The agreement states that the warden or assistant warden will meet with the Plaintiffs it in no way authorizes them to bring an entourage for what appears to the Plaintiffs to be some kind of amusement or confrontation.

28. While the Plaintiffs know these are matters outside of the Court's control at present, the Plaintiffs have attempted at all times to negotiate for enforcement and compliance in good faith. At meetings over the past three years, as dictated by the settlement agreement, there have been concessions made with the warden and the assistant warden, on the Plaintiffs behalf, which have been continually violated, not implemented, or rescinded. (**Exhibit #20**) Below are some of the issues involved:

   1) Plaintiffs were told the Deaf Community would be permitted to eat first, in order to facilitate communication needs with the Food Service Department in an area where communications are seriously hampered by a solid steel wall, with only an approximate 20" x 10" window is available for

[19]

communication; a near impossible situation for the deaf.

2) In addition, being first, Plaintiffs would not have to worry about when the unit would be called (having to remain vigilant) over often a several hour period, and knowing that once it is called, staff would often refuse to let a deaf prisoner proceed late. This accommodation was agreed to by the entire administration, and then the administration was replaced, the new administration decided to withdraw from the previous accord, and that Plaintiffs would have to eat with our units when the Defendants verbally announce, "Chow." There is no notification system in working order for meal notification. The Deaf Community must often rely upon other prisoners to get notifications.

3) Plaintiffs were told that there would be adjustable chairs for a conference device (referred to Defendants as a videophone) but the Defendants have never supplied these chairs. The conference devices are on stands that are not adjustable, and chairs need to be provided so that height

[20]

is appropriate for the utilization of sign
language communication.

4) Repeated assurances have been given by
administrative staff that line staff will
apprise the Deaf Community of
institutional activities, but the
Defendants do not and will not follow
through; there is no verification system
to assure staff makes such notifications.
There is little or no follow-up for
accountability in this regard. There are
sixty (60) or more verbal announcements
and notifications daily. The defendants
have indicated they will not provide
notifications in real time; this clearly
violates the law.

5) It has been asserted more than once that
the pagers, utilized for notification
purposes, would revert at some point to
being controlled and activated at the
institution, either by the Institutional
ADA Coordinator or otherwise; this has
never taken place, nor does it appear that
it ever will, and no reliable notification
means has been established. There is a
permanent and underlying hostility on the
part of staff toward the Deaf Community as

[21]

well as an obvious resentment over
accommodations and notifications.

6) The staff has refused to set the pagers at
the request of deaf individuals who desire
to use them. They refuse to set the pagers
at request of the institutional schedule,
stating the pagers are incapable of
programming with so many entries. They
have refused to set them to coordinate
with an electronic bulletin board; so the
Deaf Community will know when there is a
message for activities on the board; the
electronic bulletin board is not real time
and has only further confused the lack of
notification. **Section IX, A & B** (Pg. 14)
clearly delineates the Defendants will
provide an effective visual notification
system. (**See Exhibit #1**)

7) Members of the Deaf Community are
routinely being rescheduled appointments
because there is no oversight into
scheduling process, and staff has no
ability to understand how to determine who
is deaf despite having been given a list
repeatedly by the Institutional ADA
Coordinator.

[22]

8) Medical appointment scheduling is not accomplished in a way that does not interfere with other prisoners. The current system violates the settlement agreement and causes anger and frustration which is directed at the Deaf Community by other prisoners.

9) There are no indicators in bold lettering on the Deaf Offender's medical files as detailed in the settlement agreement.

10) The Medical Department refuses to schedule medical appointments with the Institutional ADA Coordinator ahead of time and in ways that coordinate other scheduled activities of the interpreters; such interference results in delays in receiving medical treatment, and the rescheduling of needed appointments.

11) The Medical Department, especially the Powhatan Medical Unit (PMU), a separate facility from the daily operation of PCC, refuses to apprise the Institutional ADA Coordinator of appointments in most instances, making interpreters difficult to schedule.

[23]

12) The deaf ID cards called for by the settlement agreement have not been made in any way to denote disability information, or to render them readily identifiable for staff. For four years the Plaintiffs have been engaged in a struggle to get the VDOC to issue a consistent indicator that clearly identifies our deaf disability, the simply state, "Deaf," without success. Currently the indicators remain a number of different colors, and in no way indicate the Plaintiffs are deaf.

13) There is still no VRI in the dispensary, and despite assertions that if a Deaf Offender is in need of a VRI the Defendants will be taken to the Powhatan Medical Unit where there is a tele-med station; no Deaf Offender has been availed of this service and medical appointments are rescheduled; this delays the process for days where medical attention is concerned. Often the Institutional ADA Coordinator must intervene in order to get a Deaf Prisoner necessary medical attention.

14) The previous verbal commitment to five Video Remote Interpreters (VRIs)

throughout the institution has never materialized. There is no dedicated VRI at the institution.

15) The institutional scheduling being standardized so that the Deaf Community can depend upon such a timetable has failed to materialize. While scheduling has improved it is not dependable; especially the count, meal, and recreation times. The Defendants have erroneously asserted the posting of this schedule is sufficient notification.

16) Despite assertions to the contrary, staff continually make accusations and insinuate that deaf individuals do not listen to them and their commands in order to cover and conceal behaviors that are inconsistent with professional standards and techniques established by training protocols and the settlement agreement for communication with the deaf.

17) Re-entry is a system wide priority, but members of the Deaf Community have been systematically excluded from the process because of their need for accommodations. Some of these prisoners should have been

[25]

in the intensive re-entry program because of their institutional needs, but have been systematically excluded. (**Exhibit #21**)

18) School, apprenticeship classes, and other educational needs have not been facilitated for the Deaf Community generally. Special education facilitation, while available for a variety of other learning disabilities, has not been extended for deafness. There has been no effort to make vocational programming suitable for deaf individuals as it is to hearing prisoners, despite repeated requests for considerations.

19) Since the date of the implementation of the settlement agreement every administrator at Powhatan Correctional Center has been replaced. The current administrators have a seemingly negative and uncooperative response to the settlement, and no working knowledge of the particulars. Discussions regarding the specifics, especially with Warden Dillman would lead one to conclude he has never read the agreement, and displays responses to specifics as if he has no legal obligation to comply with the law, or the

[26]

settlement agreement. Without rectifica-
tion we have little hope for compliance by
the present administration.

## VII. Conclusion

Therefore, for these reasons and additional legal
concerns the Plaintiffs respectfully request that this
Honorable Court reinstate the matter to the docket,
consider sanctions, and appoint an attorney to
represent the class.

Gary Minnis

David A. Richardson

Larry More

Ronald Roman

Delonte Tinsley

The named Plaintiffs active in this action currently
reside at:

**Powhatan Correctional Center
3600 Woods Way
State Farm, Virginia 23160-0002**

[27]

## CERTIFICATE OF SERVICE

I hereby certify that on this _19_ day of _October_ , 2014
a true and correct copy of Plaintiff's MOTION FOR
REINSTATEMENT TO THE UNITED STATES DISTRICT COURT, along with
notated attachments, was placed in the "Legal Mail Box" in the
Main Hallway at Powhatan Correctional Center for mailing to
the following individuals, at the addresses defined below:

    Deborah Golden, Attorney at Law
    11 DuPont Circle, N.W. - Suite 400
    Washington, D.C. 20036

    Harold Clarke, Director
    Virginia Department of Corrections
    6900 Atmore Drive
    Richmond, VA 23225

    Mark Herring, Attorney General
    Office of the Attorney General for Virginia
    900 East Main Street
    Richmond, VA 23219

_David A. Richardson_

David A. Richardson, 1058541, C5A26B
Powhatan Correctional Center
3600 Woods Way
State Farm, VA 23160